# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| **ALBERT KONRAD** | **CIVIL ACTION NO. 17-291** |
| **VERSUS** | **JUDGE ELIZABETH FOOTE** |
| **T A KOLB, ET AL** | **MAG. JUDGE KAREN L. HAYES** |

## MEMORANDUM RULING

Pending before the Court is a motion for summary judgment [Record Document 44] filed by Defendants, the City of Shreveport, Tyler Kolb ("Kolb"), Daniel Meyers ("Meyers"), R.E. Bordelon, and Alan Crump ("Crump"), which asks this Court to dismiss all claims brought by Plaintiff, Albert Konrad ("Konrad").[1] Upon consideration of the briefs filed by the parties and for the reasons stated below, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Konrad's original complaint named other Defendants, including Shreveport Police Officers Tavares, Couch, and Cain. However, upon the filing of his first amended complaint, Konrad explicitly dismissed all claims against those officers. See Record Document 14, p. 7. Konrad then filed a second amended complaint wherein he specifically excluded Officer Bordelon from the list of Defendants against whom he was bringing this action. Record Document 24. Further, the only mention of Officer Bordelon in the second amended complaint is in reference to the fact that he signed Kolb's police report. Defendants seek to dismiss Officer Bordelon because no allegations have been made against him. Plaintiff has not opposed that request. Agreeing with the Defendants that Plaintiff has failed to state any claims against Officer Bordelon, all claims against him are hereby **dismissed**, and he is terminated from this action.

## BACKGROUND

On the night of February 20, 2016, Shreveport Police Officers Kolb and Meyers responded to a call for assistance at 139.5 Dalzell Street in Shreveport, Louisiana. Record Documents 57, p. 7 and 58-1, p. 1. As demonstrated by the patrol unit's recording of the events,[2] outside of the residence the officers encountered Chuck Parker ("Parker"), the complainant. Record Document 44-3. Parker claimed that his ex-girlfriend had stolen his cell phone and that she was staying with the man who lived at 139.5 Dalzell Street. Id. The officers approached the house and knocked loudly on the front door several times. Id. Eventually, Konrad, who had been drinking during the evening,[3] opened the door holding a loaded gun. Record Documents 57, p. 7 and 58-1, p. 2. Kolb and Meyers drew their weapons and ordered Konrad to drop his gun. Id. When Konrad did not immediately comply, the officers yelled "drop it" numerous times and screamed "get back from the gun!" Record Document 44-3. Konrad did relinquish the gun, and the officers entered Konrad's house to "secure the weapon." Record Document 57, pp. 7-8. On the recording, Konrad can be heard asking the officers why they are there and what is going on. Record Document 44-3. In response, the officers yelled "sit down" a number of times and "do what I fucking tell you." Id. When Konrad did not comply, the officers forcefully pushed

---

[2] While the recording is in video format, none of the relevant events described in this opinion were visually captured on camera, as the encounter between Konrad and the officers occurred off-screen. However, the audio of the entire encounter was recorded and has been reviewed by this Court.

[3] According to the doctor's notes at University Health, Konrad reported that he had had four glasses of wine. Record Document 44-3, p. 131.

him down.  Record Documents 44-3 and 57, p. 7.  Konrad fell onto a recliner that had a glass shelf sitting on it, which was broken upon his fall.  Record Documents 57, p. 7. and 58-1, p. 3.

Meyers secured Konrad's gun by removing all of the ammunition loaded into it. Record Document 50-8, p. 46.  Meyers's statements are inconsistent regarding what he did with the ammunition from that point.  At one time, he claimed he put the bullets on the table next to the gun, Record Document 50-8, p. 46, while another time he stated that he put the gun and the bullets in separate places (the gun on the kitchen table and the ammunition on the television), Record Document 50-11, p. 44.

Monica Dixon ("Dixon"), Parker's ex-girlfriend, was inside the house as reported. Kolb questioned Dixon about Parker's stolen cell phone.  Record Document 44-3.  She denied taking Parker's phone, and Kolb asked her to provide her identification and proof that the phone she possessed, in fact, belonged to her.  Id.  Meanwhile, Konrad asked "who has my gun?"  Id.  Meyers responded that he had Konrad's gun "over here."  Id. Meyers was standing next to the gun "to make sure nobody could go back and get it." Record Document 50-8, p. 47.  Konrad demanded the gun be returned to him— "put it over here . . . put the fucking gun over here."  Record Document 44-3.  Meyers repeatedly told Konrad that he was not giving Konrad the gun back at that time.  Id.  He explained that the officers were at Konrad's house for a legal reason and they would return the gun when they left.  Id.  Konrad demanded over and over again that Meyers give him the gun, but

Meyers consistently refused.  Id.  Konrad asked for Meyers's name and badge number, which Meyers immediately supplied.  Id.

The recording demonstrates that Kolb concluded his discussion with Dixon regarding Parker's cell phone, and he then joined the conversation between Meyers and Konrad.  Id. Kolb asked Konrad for his name, to which Konrad replied "kiss my ass."  Id.  Events escalated at that point.  Konrad explained to the officers that the firearm held sentimental value to him and he would hold them responsible if anything happened to it.  Id.  Konrad still had not provided his name to Kolb, leading Kolb to warn Konrad twice that he would go to jail.  Id.  Meyers, meanwhile, can be heard reassuring Konrad that they did not intend to take the gun with them when they left.  Id.  Konrad then provided his name and date of birth to Kolb.  Id.  At the time of the incident, Konrad was 71 years old.

The exchange became heated with the officers and Konrad talking over each other. Id.  Konrad can be heard asking Kolb repeatedly for his name and badge number, while Kolb is ordering Konrad to tell the officers his age.  Id.  The recording establishes that Kolb told Konrad to sit down, followed by Konrad exclaiming "don't push me!"  Id.  Kolb states, "I swear, sir, you better sit down right now."  Id.  While it is unclear from the recording what movements transpired during this time, it suggests that Konrad did not sit down because Kolb yelled "sit down" three more times in rapid succession and then ordered Konrad to put his hands behind his back.  Id.  Konrad continued to demand that Kolb provide his name and badge number.  Id.  Next, Kolb struck Konrad in the face multiple

times. Id. at 23:04:30 - 23:04:40. The sound of the physical blows and Konrad's reaction to them can be easily discerned from the recording.

What happened in between the heated verbal exchange and the use of force is, unsurprisingly, the subject of much debate. Because there is only audio of the encounter, the parties' conflicting stories cannot be resolved by the recording itself. The Defendants contend that Konrad, who had been seated, stood up and began walking towards Kolb, Record Document 50-8, p. 49, and Konrad had clenched his fist which is perceived as a "fighting position," Record Document 50-11, p. 33. When Konrad did not sit down as ordered, the officers told him to put his hands behind his back. Record Document 50-8, p. 50. Meyers testified that he was securing Konrad's right hand while Kolb was putting on one handcuff but then Konrad "turned around pretty quickly on him, and that's when he was hit in the face." Id. Put another way, Meyers stated that Konrad "turned out of my grasp towards Officer Kolb." Record Document 50-11, p. 47. When he was hit, Konrad fell to the ground, and Kolb ordered him to put his hands behind his back. Record Document 50-8, p. 50. Konrad failed to obey and was hit in the face several more times. Id.

In stark contrast, Konrad contends that he was not being physically aggressive towards the officers. Record Document 58-1, p. 4. He admits that he demanded his gun be returned to him, but denies making any physical show of force. Id. He admits he was walking towards the officers rather than sitting down, Record Document 44-3, p. 89, but also asserts he was not given a chance to sit down because Kolb attacked him first, Record

Document 58-1, p. 4.  He admits that he turned away when Kolb started to handcuff him, Record Document 58, p. 19, but submits that he never gave Kolb any reason to think he was going to hit Kolb.  Record Document 58-1, p. 5.  Instead, Konrad asserts that his left arm is physically disabled and is not capable of being put behind his back.  Konrad argues that Kolb "lost his temper and punched Konrad in the face because Konrad asked for his name and badge number."  Id.  Once he was on the ground, Konrad alleges that Kolb continued to hit him even though he was not resisting, but rather was "laying helpless on the floor."  Id.

The fire department was called to the scene to treat Konrad's injuries.  Record Document 50-8, p. 55.  Konrad was then transported to University Health Hospital.  Id. at p. 50.  The diagnosis from University Health establishes Konrad suffered a fractured nasal bone, a fractured ethmoid bone, a maxillary fracture, eye contusions, multiple facial lacerations, and bleeding from the right eye.  Record Document 44-3, pp. 129 and 134.

Based on these events, Konrad was charged with simple assault and resisting an officer and was brought to trial in Shreveport City Court.  The judge entered a directed verdict in Konrad's favor without the defense ever presenting his case.  Record Document 50-11, p. 61.  Konrad then filed this suit under 42 U.S.C. § 1983 and state law alleging a litany of claims against the individual officers, the City of Shreveport, and Crump.  Defendants assert qualified immunity and move for summary judgment on only the

following claims: unlawful entry into Konrad's home, excessive force, failure to intervene, and the parallel state law claims.[4]

## STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075

---

[4] Defendants have not moved for summary judgment on any claims directly alleged against Crump or the City of Shreveport, and therefore none of those claims are discussed in this ruling.

[5] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

(5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. Little, 37 F.3d at 1075.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## LAW AND ANALYSIS

I.    Qualified Immunity.

Section 1983 provides a federal cause of action for the "deprivation of any rights, privileges or immunities secured by the Constitution and laws" against any person acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; rather, it merely provides remedies of rights guaranteed to citizens by the United States Constitution or other federal laws. See Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1871 (1989); City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 2432 (1985). Nonetheless, the doctrine of qualified immunity shields government officials from liability for claims against them in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). The doctrine of qualified immunity serves to shield government officials from harassment, distraction, and liability when they perform their duties reasonably, and it applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567, 124 S. Ct. 1284 (2004) (Kennedy, J., dissenting)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985). Consequently, qualified immunity

questions should be resolved at the earliest possible stage in litigation. See Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534 (1991) (per curiam). While qualified immunity is technically an affirmative defense, once it has been raised, it is the plaintiff's burden to negate the defense. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

In Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001), the Supreme Court held that a court ruling upon the issue of qualified immunity must apply a two-step analysis. First, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." Id. Second, if a violation has been established, the court must determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. See id.; Freeman v. Gore, 483 F.3d 404, 411 (5th Cir. 2007). The court may evaluate these steps in whichever order it so chooses.[6] "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." Goodson v. Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000). If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. See Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005) (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986) (holding the qualified immunity standard

---

[6]In Pearson, the Supreme Court held that while the sequence set forth in Saucier is often appropriate, it is no longer mandatory. Pearson, 555 U.S. at 236. Instead, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

"gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law.")) The question of whether an official's conduct was objectively reasonable is a question of law to be decided by the court. See Evett v. DETNTFF, 330 F.3d 681, 688 (5th Cir. 2003) (citing Mangieri v. Clifton, 29 F.3d 1012, 1016 (5th Cir. 1994)).

To be clearly established, a legal principle must be found in the holdings of either "controlling authority" or a "robust 'consensus of cases of persuasive authority,'" Ashcroft v. al-Kidd, 563 U.S. 731, 741–42, 131 S. Ct. 2074 (2011) (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692 (1999)), and defined with a "high 'degree of specificity,'" District of Columbia v. Wesby, – U.S. –, 138 S. Ct. 577, 590 (2018) (quoting Mullenix v. Luna, – U.S.–, 136 S. Ct. 305, 309 (2015) (per curiam)). It is not that a case must be directly on point, but rather existing precedent must have provided sufficient notice that the acts violate the Constitution. See Darden v. City of Fort Worth, 880 F.3d 722, 726 (5th Cir. 2018). The "clearly established" test ensures that officials have "fair warning" that particular conduct violates the Constitution. Anderson v. Valdez, 845 F.3d 580, 600 (5th Cir. 2016) (quoting Kinney v. Weaver, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

## II. Unlawful Entry.

Konrad alleges that the officers violated his Fourth Amendment rights by entering his home without his permission, without probable cause, and without a warrant.[7] As the

---

[7] The officers were permitted to approach Konrad's house to question Dixon about Parker's cell phone, and Konrad does not contend otherwise. Indeed, "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably

Supreme Court has explained, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371 (1980). Payton demonstrates that the Fourth Amendment's warrant requirement "has drawn a line at the entrance to the house." Id. at 589–90. Any warrantless intrusion into someone's residence, even if only by "a fraction of an inch" violates the Fourth Amendment. Kyllo v. United States, 533 U.S. 27, 37, 121 S. Ct. 2038 (2001). "A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." United States v. Jones, 239 F.3d 716, 719 (5th Cir. 2001). Exigent circumstances include the removal or destruction of evidence, the hot pursuit of a suspect, as well as the immediate risk to the safety of officers or others. See United States v. Richard, 994 F.2d 244, 248 (5th Cir. 1993). Such exigencies will permit what would otherwise be an unconstitutional entry into one's home. Id. However, "[t]he exigencies supporting a warrantless search may not . . . 'consist of the likely consequences of the government's own actions or inaction.'" Jones, 239 F.3d at 719 (quoting United States v. Vega, 221 F.3d 789, 798 (5th Cir. 2000)).

In this case, the Court will not assess whether the officers' entry into Konrad's home was in violation of his Fourth Amendment rights. Even if their entry constituted a violation, the officers are nonetheless entitled to qualified immunity because their actions were objectively reasonable in light of clearly established law at the time of the conduct in

---

suspect criminal activity." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001). It was not unreasonable for Kolb and Meyers to approach Konrad's house to question Dixon about Parker's allegation of a stolen cell phone.

question. The Court grounds this conclusion in the Fifth Circuit's holding in Jones. There, officers approached an apartment to talk with the occupants about complaints of drug trafficking. 239 F.3d at 718. The door to the apartment was open, but the screen door in front was closed. Id. at 719. The officers knocked on the screen door, yet could already see inside the apartment and were able to observe a handgun sitting in plain view on the kitchen table. Id. The gun was within reaching distance of another occupant inside the apartment. Id. Jones unlocked the screen door and, out of concern for officer safety, one officer entered the apartment to secure the gun. Id. It later became clear that Jones was a convicted felon and could not possess the firearm, thus he was subsequently prosecuted. Id. In a motion to suppress, Jones challenged the officers' entry into his home. Id.

The Fifth Circuit held that by leaving his front door open with a handgun in plain view to anyone standing outside, Jones had created the exigency that legally warranted the officers' entry into his home. Id. at 721-22. The court cited with approval a Second Circuit case for the proposition that "[o]nce the apartment was opened to public view by the defendants in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall." Id. at 721 n.5 (quoting United States v. Gori, 230 F.3d 44, 53 (2d Cir. 2000)). After having seen the gun, the Jones court explained that requiring the officers to turn "away from the screen door and exit[] the apartment house would have been unreasonable under the circumstances." Id. at 722. Thus, Jones established that exigent circumstances to execute a warrantless entry of one's home may exist when officers approach a residence and, due to the occupant's actions, are able to

observe a firearm inside. This is especially so when the firearm is within reach of or in the actual possession of someone inside.

In the instant case, whether or not Kolb and Meyers had sufficient probable cause and exigent circumstances to enter is not determinative. Their decision to enter is protected by qualified immunity based on Jones. Qualified immunity applies to protect officials when they perform their duties reasonably, regardless of whether they committed "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Lytle v. Bexar Cty., Tex., 560 F.3d 404, 410 (5th Cir. 2009) (quoting Saucier, 533 U.S. at 202). In evaluating this prong of qualified immunity, this Court must ask whether "the law so clearly and unambiguously prohibited [the officers'] conduct that every reasonable official would understand that what he is doing violates the law." Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (quoting al-Kidd, 563 U.S. at 740) (internal citations and marks omitted).

Here, the material facts regarding the officers' entry into the home are undisputed. Based upon those facts, this Court finds it was objectively reasonable to believe there were exigent circumstances warranting their entry into Konrad's home without a warrant. That is, it would not have been clear to every reasonable officer that entry into Konrad's home, when he opened the door inebriated and brandishing a loaded weapon, was in violation of the Fourth Amendment. Accordingly, the Defendants are entitled to qualified immunity on Konrad's unlawful entry claim, and this claim is **dismissed with prejudice**.

III.    Excessive Force.

The Defendants next move for summary judgment on Konrad's claim of excessive force.  The Fourth Amendment provides the "right to be free from excessive force during a seizure."  Trammell v. Fruge, 868 F.3d 332, 340 (5th Cir. 2017) (quoting Poole, 691 F.3d at 627).  Under qualified immunity, this Court must consider whether, viewing the facts in the light most favorable to Konrad, the officers' actions violated his Fourth Amendment right to be free from excessive force.  If Konrad can establish the violation of his constitutional right to be free of excessive force, the Court will then analyze the second element of qualified immunity, which is whether the right was clearly established at the time of the alleged misconduct by the Defendants.

A.    Constitutional Violation.

To prevail on an excessive force claim and thereby establish a constitutional violation, Konrad must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[8]  Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009) (quoting Freeman, 483 F.3d at 416).  Because reasonableness is the "ultimate touchstone" of the Fourth Amendment, Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006), excessiveness turns upon whether the degree of force used was reasonable in light of the totality of the circumstances facing the officer, Graham, 490 U.S. at 396.  Relevant

---

[8] Although Konrad stresses that he had the lawful right to resist the officers' use of force on him, based presumably upon an unlawful arrest, the right to resist (assuming the arrest was unlawful) does not affect whether the degree of force Kolb and Meyers used was excessive (which, under federal law, is determined by assuming that the underlying arrest was lawful). See Freeman, 483 F.3d at 417.

factors include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "[O]fficers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999)). The reasonableness of the officers' conduct cannot be judged with 20/20 hindsight, but rather must be assessed from the viewpoint of a reasonable officer on the scene at that very moment. See Graham, 490 U.S. at 396. Indeed,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Id. at 396-97 (internal citations and marks omitted). "Excessive force claims are [thus] necessarily fact-intensive and depend[ ] on the facts and circumstances of each particular case." Poole, 691 F.3d at 627–28 (internal citations and marks omitted). The facts must be judged objectively "without regard to [the officer's] underlying intent or motivation." Graham, 490 U.S. at 397. As such, an officer's ill will or evil intentions are not determinative. Id.

In the instant case, the Defendants do not seriously dispute that Konrad was injured as a result of his encounter with Kolb and Meyers. While they state that the injuries are relatively common, they concede the injuries occurred as a result of the force used by Kolb

and concede that the injuries appear, at least at first blush, severe. The thrust of the question before the Court then is whether the force used by the Defendant officers was excessive and unreasonable.[9] As discussed further below, the parties have presented a number of disputes of material fact including whether Kolb could have reasonably believed Konrad was about to strike him, whether or how much Konrad was resisting when the officers tried to handcuff him, whether or how much he continued to resist once on the ground, the amount of force used at each stage of the encounter, and whether that force was reasonable. Taking the facts in the light most favorable to Konrad, this Court finds that a jury could conclude that the use of force was excessive and objectively unreasonable.

The Court considers the <u>Graham</u> factors of the severity of the crime at issue, whether Konrad posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. First, Konrad was suspected of no crime whatsoever. The officers were at his home that night to question Dixon about a possible stolen cell phone, which was a matter wholly unrelated

---

[9] In analyzing whether the use of force was clearly excessive and clearly unreasonable, the Court must consider "each officer's actions separately, to the extent possible." <u>Poole</u>, 691 F.3d at 628. The briefing by the parties is inconsistent, at best, about Meyers's use of force. The parties seemingly agree that it was Meyers who pushed Konrad into the recliner upon the officers' initial entry into the house. However, it is unclear whether he subsequently used force on Konrad. The defense has submitted that Meyers performed the takedown maneuver that resulted in Konrad being forced to the ground, yet Meyers has also stated elsewhere that he merely slipped on glass and ended up on the floor with Konrad and Kolb. While this opinion will primarily focus on Kolb's use of force, it is apparent that there are genuine unresolved issues of fact surrounding Meyers's actions on this night. Therefore, while a jury may ultimately find that Kolb, not Meyers, is the officer responsible for the use of force on Konrad, this Court cannot make such a determination at this stage.

to Konrad. Thus, Konrad was not suspected of any crime, not to mention a violent crime.

Next, the Court evaluates whether Konrad posed an immediate threat to the safety of the officers or others. It is in considering this inquiry that a jury could find the Defendants' version of events fails to withstand scrutiny. Indeed, their account of events is essentially that they encountered an inebriated, belligerent, aggressive older man who answered his front door with a loaded gun in his hand. The Defendants' summary judgment briefing hinges on the theory that Kolb's use of force was necessary to prevent Konrad from reaching the gun which, theoretically, could have been used against the officers. The defense has represented that the officers "believed he was moving towards the firearm which was still in the residence. There was an immediate risk of death or serious bodily injury if Konrad was able to reach the firearm and the officers had to act quickly in order to subdue Konrad and gain control of the situation." Record Document 57, p. 20. They further argue, "[a]s Konrad was walking towards Officer Kolb, it was reasonable for the officers to believe that he was trying to reach for the weapon. The officers' [sic] acted quickly and escalated only to the use of force which was necessary to secure Konrad." Id. at p. 22. Finally, they state "Konrad posed an immediate threat to their safety due to the proximity of the weapon." Id.

However, the Defendants themselves have stated that Meyers had already secured the weapon before the use of force occurred. And, in fact, Meyers testified under oath in city court that he separated the bullets from the gun, placing them in two different locations. That admission substantially undercuts any alleged fear the officers may claim to have had that Konrad would reach the weapon and use it against them.

Moreover, everyone has agreed that Konrad was wearing no pants during this encounter. During the criminal trial in city court, the officers testified that Konrad was naked from the waist down; but before this Court, the representation is that he was wearing underwear. Regardless of the exact state of dress, it seems fairly obvious to this Court that no one feared Konrad was hiding extra ammunition elsewhere on his person. Thus, even if he reached the "secured" gun, the Defendants have not claimed that they would have been in any real danger. The Court does not suggest that pointing an unloaded weapon at police officers is ever ideal or even acceptable. However, in terms of assessing the "facts as a reasonable officer would perceive them," the Defendants' theory that Konrad posed a threat to them by reaching for the gun is severely overwrought.

Also troubling is the fact that Defendants have presented inconsistent theories as to why Konrad constituted such a danger. Aside from claiming that Konrad had to be neutralized before he could access the gun, elsewhere in the record Kolb's justification for hitting Konrad is that Konrad was about to hit him. He had to strike first. Under that scenario, Kolb was trying to handcuff Konrad but Konrad managed to get one of his hands free and turned around to confront Kolb. That is when Kolb struck Konrad. Significantly, Kolb has not asserted that he hit Konrad *because* he was walking towards the gun, nor has he said he hit Konrad *when* Konrad was walking towards the gun. Rather, when Konrad is struck by Kolb, he is in the process of being handcuffed. Kolb and Meyers have stated under oath that Kolb hit Konrad because he feared Konrad may hit him first. It was officer

safety, they claim; but that fear for officer safety arose from the threat of physical blows, not from Konrad crossing the room and accessing his gun.

Thus, in trying to assess whether Konrad presented a threat to the safety of the officers or others, the Court would be remiss to find anything other than that genuine disputes of fact remain, especially considering the Defendants' internally inconsistent version of the events and their inconsistent and alternative justifications for using force on Konrad. But it must be noted that the officers had removed Konrad's weapon from him, they could see his hands, and therefore they knew he had no weapon. A jury could also find that they knew there was both a significant age and size differential between Konrad and the two officers.

As to the third factor of whether Konrad was actively resisting arrest or attempting to evade arrest, the Court finds there remains a genuine dispute of material fact.[10] In simplest terms, Konrad, who must be believed at this stage of the proceedings, insists he was not actively resisting arrest. The Defendants insist he was. Thus, the third <u>Graham</u>

---

[10] It is concerning to the Court that the Defendants have not attempted to explain why Konrad would have been arrested at all. In fact, it seems to be a foregone conclusion in their minds that he was in the process of being arrested and force was necessary because he "resisted" arrest, yet no legal explanation has been provided to support said arrest. The Court is well aware that after these events, Konrad was charged with resisting arrest, a charge which was dismissed upon directed verdict in his favor. The act of resisting, itself, cannot be the cause of his "arrest" because, according to the defense, Konrad only resisted <u>after</u> Kolb tried to handcuff him. But what legal cause justified the use of the handcuffs in the first place and what level of suspicion supported that? The Court need not make this determination at this stage of the proceedings, but points this out to the parties so they may be aware of yet another factual issue that is relevant to these proceedings.

factor must be resolved in Konrad's favor. In sum, the Graham factors suggest that the use of force was excessive.

Furthermore, the Fifth Circuit has stressed that a relevant consideration in determining whether an officer's force was excessive to the need is the "speed with which an officer resorts to force . . . ." Trammell, 868 F.3d at 342. If he resorts to force quickly before employing other negotiation tactics or attempting "measured and ascending" responses commensurate with the plaintiff's conduct, then those circumstances militate against a finding of reasonableness. Id. The speed with which Kolb resorted to force is another consideration to be made by the jury in this matter.

As set forth above, viewing the facts in the light most favorable to Konrad, the Court concludes that he has established injuries resulting directly and solely from force that was excessive to the need and objectively unreasonable under the circumstances.

B.     Clearly Established Law.

The Court next considers the second prong of the qualified immunity analysis, that is, whether the officers' actions were objectively reasonable in light of clearly established law at the time of the conduct in question. "[A]lthough the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat," the degree of force that is allowed to be employed depends on the Graham factors. Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008) (internal quotation marks omitted). It is clearly established law that an officer cannot violently strike an arrestee who has been subdued and is not resisting. See Ramirez v. Martinez, 716 F.3d 369, 379 (5th Cir. 2013); Bush, 513

F.3d at 502. Further, it is clearly established law that violently slamming or striking a suspect who is not actively resisting constitutes an excessive use of force. Darden, 880 F.3d at 731 (holding that this right was clearly established as of 2013); Newman v. Guedry, 703 F.3d 757, 764 (5th Cir. 2012).

Under circumstances similar to the instant case, the Fifth Circuit has refused to characterize the pulling away of one's arm from an officer's grasp as active resistance, and thus did not approve the use of force used on the arrestee. Goodson, 202 F.3d at 740. In Goodson, the officers lacked reasonable suspicion to detain or frisk the plaintiff, and he was not fleeing; therefore, the Fifth Circuit declined to find that his decision to pull his arm away from the officers justified their use of force. Id.; see also Trammell, 868 F.3d at 343 (holding that by at least 2000, it was clearly established law that it was "objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp.").

It is also clearly established law that officers are required to "assess the relationship between the need and the amount of force used." Newman, 703 F.3d at 763 (quoting Deville, 567 F.3d at 167). In Deville, the Fifth Circuit held that a reasonable jury could find that the use of force was not justified when the officer failed to negotiate with the suspect but instead quickly resorted to breaking her car window and dragging her out of the vehicle. 567 F.3d at 168. Likewise, in Newman, the Fifth Circuit explained that it was objectively unreasonable for an officer to tase and strike the plaintiff arrestee with a

nightstick without resorting to other less violent means when the arrestee's behavior could not be considered active resistance. Newman, 703 F.3d at 763.

Here, if Konrad's allegations are to be believed, his decision to pull his arm from Kolb's grasp cannot legally justify Kolb's use of force. A jury could find that Kolb resorted to strikes to Konrad's face and head without employing ascending means of physical skill, negotiation, and/or command. Because using force against someone who is not actively resisting is in violation of clearly established law, the Defendants are not entitled to qualified immunity on Konrad's excessive force claim. Summary judgment is thus inappropriate.

IV. Failure to Intervene.

Konrad has alleged that Meyers is liable under § 1983 for failing to prevent Kolb from violating his rights, and that reciprocally, Kolb is liable for failing to prevent Meyers from violating his rights. Record Document 24, p. 10. Defendants move for summary judgment on this claim, providing two mere sentences in support: ". . . Plaintiff cannot establish the use of excessive force. In the absence of such force, Plaintiff's claim for failing to intervene is without merit and must be dismissed." Record Document 57, p. 24.

"[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under [§] 1983" if the first officer "acquiesce[d]" in the constitutional violation. Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995). The non-intervening officer must "know[] that a fellow officer is violating an individual's constitutional rights." Whitley v. Hanna, 726 F.3d 631,

646 (5th Cir. 2013) (quoting <u>Randall v. Prince George's Cty.</u>, 302 F.3d 188, 204 (4th Cir. 2002)). Here, due to the number of material facts in dispute and taking into account the lack of any argument or analysis by the Defendants to support this aspect of their motion, the Court finds summary judgment is improper on this claim.

V.     <u>State Law Claims.</u>

Finally, Defendants move for summary judgment on Konrad's state law claims of unlawful entry and excessive force.   As it concerns the doctrine of qualified immunity under Louisiana state law, the Supreme Court of Louisiana has explained that though the Louisiana Constitution creates a private right of action against those who violate rights secured thereunder, those who act under color of state law in doing so are entitled to the protection of qualified immunity from liability for violations of the Louisiana Constitution. <u>See</u> <u>Moresi v. State Through Dept. of Wildlife and Fisheries</u>, 567 So. 2d 1081, 1091-95 (La. 1990).   In so holding, the Court applied the same standard as federal law for deciding whether a person's actions are protected by qualified immunity. <u>See</u> <u>id.</u> at 1094. Thus, Louisiana applies the same standard as federal law for deciding whether an official's actions are protected by qualified immunity.   This compels the conclusion that Konrad's state law claim of unlawful entry shall be dismissed based on the Court's foregoing analysis as to exigent circumstances and qualified immunity.   Therefore, Konrad's state law claim of unlawful entry is **dismissed with prejudice**.

As to Konrad's claim of excessive force, Louisiana employs the same standard to analyze excessive force claims as the federal constitutional standard. <u>See</u> <u>Reneau v. City</u>

of New Orleans, 2004 WL 1497711, *4 (E.D. La. July 2, 2004) (citing Kyle v. City of New Orleans, 353 So. 2d 969, 973 (La. 1977)).  Because there are genuine disputes of material fact surrounding the officers' use of force, and because it is inappropriate to grant summary judgment under § 1983, the Court finds it is also improper to grant summary judgment on the state law claim of excessive force.  Therefore, summary judgment is denied as to this claim.

VI.    Miscellaneous.

The Court has reviewed the proposed pretrial order submitted by the parties and finds Paragraph A lacking, in that it is vague and subject to varying interpretations of what precise claims have been alleged.  The Court hereby **ORDERS** the parties to jointly craft a list setting forth the specific claims remaining in this case and the particular Defendants alleged to be liable for each of those claims.  A general statement that the Plaintiff alleges violations of his Second, Fourth, and/or Fourteenth Amendments, without accompanying explanation of the precise nature of those violations (for example: excessive force, failure to train, et cetera), is insufficient and unacceptable.  If the parties cannot agree as to a claim or the Defendant against whom the claim has been made, they must identify their area of disagreement for the Court.

Paragraph B excludes Crump as a named Defendant, contrary to the prior filings by the parties.  The parties must clarify whether this is intentional or an omission.

Finally, the parties must also identify the damages that remain available for <u>each</u> specific claim and enunciate any prohibitions on the recovery of certain damages for any particular claim.

This joint submission is due by **August 19, 2019**.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  It is granted as to Konrad's § 1983 claim of unlawful entry, as well as the parallel Louisiana state law claim.  Those claims are dismissed with prejudice.  The motion is denied in all other respects.

Joint briefing for the Court, as set forth above, is due by **August 19, 2019**.

**THUS DONE AND SIGNED** this 13 day of August, 2019.

ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE